**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION AT LAFAYETTE**

| | |
|---|---|
| **STEVE HOLMES,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **CAUSE NO: 4:06-cv-00114-AS** |
| ) | |
| **THE TRUSTEES OF PURDUE** ) | |
| **UNIVERSITY, ET AL.,** ) | |
| ) | |
| **Defendants.** ) | |

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on the Motion for Summary Judgment (Doc. No. 66) filed by Defendants The Trustees of Purdue University ("Purdue"), Debra Steiner, in her individual and official capacity, and William Miller, M.D., in his individual and official capacity (collectively "Defendants"). The parties have fully briefed the issues and the Court heard oral argument on the motion in Lafayette, Indiana on October 22, 2008. For the reasons discussed below, the Defendants' Motion for Summary Judgment is granted, and the trial set for January 12, 2009 is vacated.

## I. INTRODUCTION

This case considers Plaintiff Steve Holmes' ("Mr. Holmes") Third Amended Complaint (Doc. No. 34) filed on February 5, 2007. Mr. Holmes alleges that Purdue discriminated against him based on sex, and retaliated against him for reporting what he believed to be unlawful treatment to Purdue's Human Resources ("HR") Department and/or to the Equal Employment Opportunity Commission ("EEOC"), all in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et. seq.* and 42 U.S.C. § 1981a. Mr. Holmes also alleges that Ms. Steiner and Dr. Miller, in their individual and official capacities, discriminated and retaliated against him on the basis of his

disability in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et. seq.*

## II. STANDARD OF REVIEW

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper only if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See Nebraska v. Wyoming*, 507 U.S. 584, 590 (1993); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). In deciding a motion for summary judgment, a court must view all facts in the light most favorable to the nonmoving party as well as draw all reasonable and justifiable inferences in favor of that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *NUCOR Corp. v. Aceros Y Maquilas De Occidente*, 28 F.3d 572, 583 (7th Cir. 1994).

The moving party bears the burden of identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits" that the moving party believes demonstrate an absence of genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once this burden is met, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e); *Becker v. Tenenbaum-Hill Assocs., Inc.*, 914 F.2d 107, 110 (7th Cir. 1990); *Schroeder v. Lufthansa German Airlines*, 875 F.2d 613, 620 (7th Cir. 1989). "[A] party who bears the burden of proof on a particular issue may not rest on its pleading, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact which requires trial." *Beard v. Whitley County REMC*, 840 F.2d 405, 410 (7th Cir. 1988). Therefore, if a party fails to establish the existence of an essential element on which the party bears the burden of proof at trial, summary judgment is proper. In this situation, there can be "'no genuine issue of any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at

## III.  FACTUAL BACKGROUND

The Trustees of Purdue University is a body corporate created by the Indiana legislature, I.C. 21-23-2-2, that operates Purdue University, I.C. 21-27-7-4, 21-27-7-5.  The Trustees of Purdue University have the power to "govern, by regulation and other means, the conduct of students, faculty, employees, and others while upon the property" and to "dismiss, suspend, or otherwise punish any student, faculty member, or employee of the institution who violates the institution's rules or standards of conduct." I.C. 21-39-2-2, 21-39-2-4.

Purdue University Student Health Center ("PUSH") is a student health facility operated by Purdue University and located on its campus, and consists of a medical clinic, counseling department, and wellness office.  Radiologic Technologists ("R.T.'s") at PUSH take x-rays and, if properly licensed, can administer non-radioactive materials into a patient's bloodstream for diagnostic purposes.  R.T.'s must follow physician's orders precisely and must conform to regulations concerning the use of radiation to protect themselves, their co-workers, and the patient from unnecessary radiation exposure.  The x-rays are developed by the R.T. and presented to a radiologist for reading.  As discussed below, Mr. Holmes was the only PUSH R.T. who held a Limited General Certificate.  Each of the other R.T.'s employed at PUSH, Corrine Rody ("Rody") (female), Sue Oppy ("Oppy") (female), and Terry Hamilton ("Hamilton") (male), held General Certificates, which permitted them to perform a wider variety of diagnostic tests, and, to do so without direct on-site physician supervision.  Rody was employed full-time as the department supervisor, and Oppy and Hamilton were part-time employees.

Sarah Sayger, M.D. ("Dr. Sayger") directly supervised the Radiology Department at PUSH

until October 2005, when Debra J. Steiner ("Ms. Steiner") was promoted to Supervisor and became responsible for the day-to-day operations of the Radiology Department and for evaluating the performance of the four R.T.'s, including Mr. Holmes. Although she was Mr. Holmes' immediate supervisor, Ms. Steiner did not have the authority to hire/fire/reinstate Mr. Holmes, or any other employee. Ms. Steiner only reported personnel disciplinary issues to Dr. Sayger, the PUSH Clinical Director, who possessed the ultimate authority to assess disciplinary measures, including termination, and who provided all of Mr. Holmes' evaluations to him during his employment.

William Miller, M.D. ("Dr. Miller") is the radiologist contracted to read x-rays at PUSH for the past 30 years. Dr. Miller is not an employee of Purdue and has no authority to hire, fire or discipline any Purdue employee, but he has substantial input regarding the technical performance of the R.T.'s employed in the PUSH Radiology Department. As a licensed physician, Dr. Miller has the obligation to report technical errors that he witnesses to PUSH's Clinical Director, the Quality Improvement Committee, or to the Director, James Westman, Ph.D.

Mr. Holmes obtained his Limited General Certificate for Radiologic Technology in the summer of 2003. As an R.T. with a Limited General Certificate, Mr. Holmes was unable to work without direct on-site supervision from a licensed physician, and was unable to administer non-radioactive materials into patient's bloodstreams for diagnostic purposes.

Mr. Holmes was first employed as an R.T. at PUSH two-days per week in July, 2004, after being interviewed by Dr. Sayger, Dr. Miller, and Dr. Krauss (and received a letter of recommendation from Ms. Steiner). Mr. Holmes began full-time employment as an R.T. at PUSH in August, 2004, under a 90-day probationary period beginning August 14, 2004— during which time, Mr. Holmes received many compliments, with Dr. Sayger indicating that he could become the

next supervisor. When Mr. Holmes began his employment with Purdue, he was aware of and understood his R.T. job duties, as listed in a Purdue Manual, and he was familiar with PUSH's standards/protocols for taking x-rays.

On November 9, 2004, Mr. Holmes met with Dr. Sayger and Dr. Miller to evaluate Mr. Holmes' performance following completion of the 90-day probationary/evaluation period. In that meeting, Mr. Holmes was advised that he was mislabeling x-ray orientations (improper "lefts and rights"), incorrectly spelling patient names, and transposing patient identification numbers. As a result of these performance issues, Mr. Holmes' probationary period was extended for an additional 90-day evaluation period, and Mr. Holmes was to meet with Dr. Sayger every two weeks to review and discuss his progress. Defendants Dr. Miller and Ms. Steiner each provided information for Dr. Sayger to consider for evaluation of Mr. Holmes' performance.

A few days after the November 9, 2004 meeting, Mr. Holmes told Dr. Sayger that he believed he had a learning disability, or dyslexia. Dr. Sayger responded that she would see if Dr. James Westman would have Mr. Holmes tested— but no one followed-up on Mr. Holmes' concern, and he never received any testing. Thereafter, Mr. Holmes completed his probationary period in February 2005, and ceased being a provisional employee.

On May 17, 2005, Dr. Sayger and Dr. James Westman met with Mr. Holmes. At that time, Mr. Holmes was presented with a list of concerns and issues related to his job performance. During this meeting, Dr. Sayger and Dr. Westman showed Mr. Holmes x-rays that Dr. Miller had pulled aside because Mr. Holmes mislabeled the orientation of the x-rays. They also related their concerns that Mr. Holmes was not using the established x-ray protocol at PUSH resulting in over-radiation of patients, was improperly performing x-rays of the lumbar spine and chest contrary to PUSH

5

protocols, and was having more than his share of x-ray retakes. Mr. Holmes told Dr. Sayger that he would do his best to correct the problems discussed.[1] Mr. Holmes again informed Dr. Sayger of his belief that he had a learning disability or dyslexia, and again Dr. Sayger suggested that Mr. Holmes be tested.[2]

In August, 2005, Mr. Holmes met with Dr. Sayger for a performance review. Dr. Sayger evaluated Mr. Holmes' job knowledge and quality of work at the level of "approaches standard"— the second lowest rating possible. On the other hand, Mr. Holmes received an "above standard" rating for professionalism and teamwork, and an "at standard" rating for his quantity of work. There was no mention or reference to retakes or transpositional errors.

On October 19, 2005, Ms. Steiner became the supervisor of the PUSH Radiology Department.[3] The next month after her promotion, Ms. Steiner wrote a note to Mr. Holmes personnel file about his committing a violation of The Health Insurance Portability and Accountability Act (for which he was not disciplined). In addition, Ms. Steiner no longer allowed Mr. Holmes to cover after-hours student athletic functions because of his limited license, changed the "retake" policy by making the technologists initial the incorrect x-ray and place it in the patient's

---

[1] Mr. Holmes testified thereafter that he understood the performance expectations as communicated to him in the May 17, 2005 memorandum resulting from the meeting.

[2] Defendants allege that Mr. Holmes never told Dr. Sayger or Dr. Westman that he believed that he had a learning disability which prevented him from meeting their employment expectations. This is true because Mr. Holmes testified that he did not "recall" anything that prevented him from meeting Purdue's employment expectations, nor did he specifically tell Dr. Sayger or Dr. Westman that he believed his learning disability "prevented" him from meeting the expectations. Yet, it is also uncontested that Mr. Holmes testified that he did "indicate" to Dr. Sayger and Dr. Westman that his learning disability had something to do with his failure to meet the performance expectations. (Holmes Depo., p. 83-85).

[3] Debra Steiner's Declaration states that she has been the supervisor of the Radiology Department at PUSH since October 2006; yet, in her deposition she states that the proper year is 2005. (Steiner Decl., ¶ 5, Steiner Depo., p. 11). The Plaintiff suggests that the proper date is October 2005, and, for the purposes of summary judgment, the Court agrees.

x-ray jacket, and instructed Mr. Holmes to recheck his placement of x-ray files in the view-box to be sure that they were properly placed— all due to mistakes made by Mr. Holmes and other technicians.

On January 10, 2006, Mr. Holmes met with Ms. Steiner, Dr. Miller, and Dr. Sayger to discuss his performance. Mr. Holmes understood that the purpose of this meeting was that he had 30 days to bring his work up to standard, or he would be terminated. In fact, Mr. Holmes was presented with a written memorandum ("the January 10 memorandum") citing fifteen areas in which his performance needed to improve. Specifically, Mr. Holmes was told that each one of his x-ray films would be reviewed for several characteristics.[4] Mr. Holmes understood the expectations in each of the enumerated areas, and testified that the expectations set forth in the January 10 memorandum were reasonable for any R.T. at PUSH, and that there was nothing preventing him from meeting the enumerated expectations. (Holmes Depo. P. 106-08). Holmes disagreed with his assessment, but understood that he was placed on a 30-day evaluation period.

---

[4]     Mr. Holmes was advised that it was "imperative that [the following] deficiencies dramatically be corrected in order to avoid suspension and/or termination of [his] employment from Purdue University":
A. Identification, including labeling and demographic information on the original film emulsion.
B. Collimation
C. Positioning
D. Technique (density and contrast)
E. Using proper size film per exam
F. Repeat rate
G. Special instructions (compliance with special instructions that are listed on the request)
H. Proper film labeling, left, right, LPO, RPO, etc.
I. Recording additional information, i.e., location of pain, relevant history, call result, etc.
J. Films will be hung on Radiologist view boxes correctly.
K. Recheck patient labeling data to assure accuracy of spelling, ID numbers and other pertinent data.
L. **All** repeat films will be placed in patient folder for Dr. Miller to review.
M. At **all** times, review and adhere to established x-ray protocol. Patient exposure to undo [sic] amounts of radiation will result in suspension of duties and/or termination of employment.
N. All examinations will be reviewed by the departmental supervisor and the Radiologist at the end of the 30 days. Findings will be discussed in detail at a follow-up meeting.
O. You will demonstrate a positive, professional demeanor at all times.
(Holmes Depo., Exb. L).

A few days after the January 10, 2006 meeting, Mr. Holmes met with Human Relations Consultant Connie Reckowsky ("Ms. Reckowsky"), and told her that he thought the January 10 evaluation was incorrect and that he was being singled out. Mr. Holmes admitted that he told Ms. Reckowsky that he believed he was being singled out because he held a limited license as opposed to a general license. (Holmes Depo., p. 110-11). Mr. Holmes could not recall telling Ms. Reckowsky that it was because he was a man, and Mr. Holmes admitted that he never told Ms. Reckowsky that he was unable to fulfill any of the job performance expectations set out in the January 10 memorandum due to a learning disability. *Id*. Mr. Holmes did not file a grievance with Purdue due to the January 10 memorandum, rather, Mr. Holmes told Ms. Reckowsky that he was going to stick it out and do his best to keep his job and show that he could be "a good tech." *Id*.

On January 16, 2006, Mr. Holmes received an addendum ("second memorandum") to the previous January 10 memorandum, which instructed him to work with supervision at all times in order to limit radiation to patients, and informed him that he was not to take x-rays of the "head, spine (cervical, thoracic and lumbar), or abdominal radiography due to the focus to limit radiation to our patients." (Holmes Depo., Exb. M). In addition, a follow-up meeting was scheduled for February 9, 2006 in order to evaluate Mr. Holmes' performance (based on the January 10 memorandum).

On January 19, 2006, three days after he received the second memorandum, Mr. Holmes filed an EEOC charge, alleging reverse gender and disability discrimination.

On February 1, 2006, Ms. Steiner met with Ms. Reckowsky and filled out a "Workplace Threat Assessment Checklist" indicating that Dr. Miller was intimidated by Mr. Holmes (despite not having witnessed any such events), and alleging that Mr. Holmes had a history of making threats and

using intimidation— Ms. Steiner later admitted that Mr. Holmes never made threats to anyone at PUSH, but that she personally felt intimidated by Mr. Holmes' threat to quit. (Steiner Depo., p. 33-42, Exb. 18).

Defendants allege that Mr. Holmes' performance did not improve following the January 10 memorandum. Mr. Holmes admitted that during his final 30-day probational period, each individual had to log their own x-ray retakes. During the period of time spanning January 11, 2006 through February 3, 2006, Defendants assert that Mr. Holmes was responsible for 58.3% of PUSH's Radiology Department's repeats of chest x-rays, that he accounted for seven repeat examinations during that time period (while the combination of Ms. Steiner, Rody, Oppy, and Hamilton accounting for five repeat examinations), and that Mr. Holmes accounted for 83.3% of the Department's repeats of x-rays to extremities and for ten repeated extremity examinations during the time period (while the rest of the R.T.'s in the Department accounted for a total of two). Because Mr. Holmes argues that the statistics are inaccurate, as admitted to by Ms. Steiner, the Court assumes that they are, yet, notes that Defendant does not deny responsibility for some retakes. (Steiner Depo., p. 46-53).

Mr. Holmes' employment with Purdue was terminated on February 9, 2006, on the basis alleged by Purdue, that he failed to address the concerns regarding his performance. (Holmes Depo., p. 131-32, Exb. Q).

Mr. Holmes was aware that Purdue had policies against gender and disability discrimination, but he did not file any complaint with any internal Purdue office alleging discrimination. Mr. Holmes is no longer licensed as a R.T., as his license expired sometime in 2007, and in order to be employed as an R.T. at PUSH, an individual must be licensed by the State of Indiana to perform the

examinations.

## IV.  DISCUSSION

The Court turns to Mr. Holmes' allegation that Purdue discriminated against him based on sex, and retaliated against him for reporting what he believed to be unlawful treatment to Purdue's HR Department and/or to the EEOC, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et. seq.* and 42 U.S.C. § 1981a.

### A)        Title VII discrimination claim against The Trustees of Purdue University

Title VII of the Civil Rights Act of 1964 provides that it "shall be an unlawful employment practice for an employer . . . to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex." 42 U.S.C. § 2000e-2(a)(1).  To prevail on his sex discrimination claim, Mr. Holmes must either proffer direct or circumstantial evidence of his employer's discriminatory motivation/intent (known as the direct method), or rely on the indirect burden-shifting method outlined in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). *See Mills v. Health Care Serv. Corp.,* 171 F.3d 450, 454 (7th Cir. 1999).

During oral argument, counsel for Mr. Holmes asserted that he is not conceding the 'indirect method' argument.  Yet, no evidence was discussed in an attempt to survive summary judgment under the indirect method.  With an abundance of caution, the Court briefly considers the same. Under the indirect approach, a plaintiff must present evidence tending to show: (1) he was a member of a protected class; (2) he was meeting his employer's legitimate performance expectations; (3) he suffered an adverse employment action; and (4) he was treated less favorably than similarly situated employees outside of his protected class. *See Dunn v. Nordstrom, Inc.,* 260 F.3d 778, 784 (7th Cir.

2001); *see also Metzger v. Illinois State Police,* 519 F.3d 677, 681 (7th Cir. 2008); *Hague v. Thompson Distribution Co.*, 436 F.3d 816 (7th Cir. 2006). The court applies a modified standard with regard to the first element of the *prima facie* case required to establish reverse sex discrimination, and thus, Mr. Holmes must show background circumstances sufficient to demonstrate that the particular employer has 'reason or inclination to discriminate invidiously against [men]' or evidence that 'there is something fishy about the facts at hand.' *Id*. If the plaintiff can establish these four elements, the defendant has an opportunity to articulate a legitimate, nondiscriminatory reason for its action. *Id*. If the defendant does so, the burden shifts back to the plaintiff and he must offer evidence showing that the defendant's excuse is pretextual. *Id*.

Other than suffering termination, Mr. Holmes has certainly failed to establish the first, second, and forth prongs of the *prima facie* case. Mr. Holmes has not shown any inclination of Purdue to discriminate against men, especially when Purdue employed men at PUSH, such as Terry Hamilton. The record is simply void of any so-called "fishy facts." Also, Mr. Holmes has not identified any similarly situated female given preferential treatment. First, and most distinguishing, Mr. Holmes was the only PUSH R.T. who held a Limited General Certificate. All of the other R.T.'s held General Certificates, which permitted them to perform a wider variety of diagnostic tests without direct on-site physician supervision. Second, Mr. Holmes was the only R.T. repeatedly placed on probationary status for his admitted mistakes. Third, the female employees Mr. Holmes identified, Dr. Sayger, Ms. Steiner, Rody, and Oppy, were not similarly situated. Not only did they not hold Limited General Certificates like Mr. Holmes, which resulted in different job responsibilities, but Dr. Sayger and Ms. Steiner were supervisors who directly supervised the R.T.'s, including Mr. Holmes, Rody was also a department supervisor, and Oppy was only a part-time

employee. Thus, no evidence of a similarly situated female employee treated more favorably than Mr. Holmes exists. *See Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617-18 (7th Cir. 2000) (a similarly situated employee must be "directly comparable in all material respects," such as, whether the employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them).

So too, Mr. Holmes failed to show he was meeting his employer's legitimate performance expectations, or that Purdue's legitimate, nondiscriminatory reason for his termination— his performance— was pretextual. *See Gordon v. United Airlines, Inc.*, 246 F.3d 878, 886 (7th Cir. 2001) ("[The] issue of satisfactory job performance often focuses on the same circumstances as must be scrutinized with respect to the matter of pretext."). It is undisputed that Mr. Holmes was placed on a second 90-day probationary status before Ms. Steiner became the supervisor of the PUSH Radiology Department or before he ever reported to Dr. Sayger that he suspected he suffered from a learning disability. Mr. Holmes was placed on this second probationary period for his poor job performance, for mistakes that he does not deny making. Mr. Holmes did not cease making those mistakes. It was only after another meeting in May 2005, in which Dr. Sayger and Dr. James Westman met with Mr. Holmes and presented him with a list of concerns and issues related to his job performance, that Mr. Holmes then discussed his possible learning disability. Defendants' dissatisfaction with Mr. Holmes had been made known to him before he suggested that he had dyslexia. There is no evidence to suggest that Mr. Holmes' was being treated differently on the basis of a disability, or his sex.

In August, 2005, Dr. Sayger evaluated Mr. Holmes' job knowledge and quality of work at

the level of "approaches standard"— the second lowest rating possible. After another meeting in January 2006, Mr. Holmes knew that if he could not prove himself to be a "good tech" in his final probationary period, then he would be terminated. It is undisputed that Mr. Holmes was not meeting his employer's legitimate performance expectations, and this Court finds that Purdue's legitimate, nondiscriminatory reason for his termination— his performance, was not pretextual. *See Gordon*, 246 F.3d at 886. Thus, Mr. Holmes must, and has, "elect[ed] to establish his claim of reverse gender discrimination under the direct method of proof." (Holmes' Memo. in Opp., p. 12).

Under the direct method, Mr. Holmes must present direct or circumstantial evidence that his employer took materially adverse action against him—here, being placed on probationary status and later terminated—on account of impermissible purpose, such as his being male. *Rhodes v. Illinois Dept. of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004); *but see*, *Stone v. City of Indianapolis Public Utilities Division*, 281 F.3d 640, 644 (7th Cir. 2002) *clarified by Gates v. Caterpillar, Inc*., 513 F.3d 680, 686 (7th Cir. 2008) (finding that circumstantial evidence is relevant and probative on any of the elements of a direct case) (citing *Sylvester v. SOS Children's Villages of Ill., Inc.*, 453 F.3d 900, 902 (7th Cir. 2006) and *Treadwell v. Office of Ill. Secretary of State*, 455 F.3d 778, 781 (7th Cir. 2006)). Direct evidence is evidence that "if believed by the trier of fact, would prove discriminatory conduct on the part of the employer without reliance on inference or presumption." *Rhodes,* 359 F.3d at 504. Direct evidence generally involves an admission or a statement by the decisionmaker regarding his discriminatory intent. *Lewis v. School Dist. #70*, 523 F.3d 730, 742 (7th Cir. 2008). Circumstantial evidence "allows the trier of fact to *infer* intentional discrimination by the decisionmaker." *Id.* Direct evidence is not required under the direct method of proof; circumstantial evidence that suggests discrimination, "albeit through a longer chain of inferences," is sufficient. *Id*.

Here, Mr. Holmes concedes that he has no direct evidence of discrimination or retaliation (Holmes' Memo. in Opp., pp. 12, 23-24), thus he must construct a "convincing mosaic" of circumstantial evidence in order to succeed on his discrimination and retaliation claims. *See Troupe v. May Dept. Stores Co.*, 20 F.3d 734, 737 (7th Cir. 1994). In that vein, Mr. Holmes has also conceded that he has not "uncovered . . . evidence of an admission by the decision-maker that his actions were based upon the prohibited animus," but that the suspicious timing, the disparate treatment of similarly situated non-protected employees, and evidence of pretext, allow this Court to infer discriminatory intent on the part of Purdue. (Holmes' Memo. in Opp., pp. 12-23).

On the timing issue, the Court notes that Mr. Holmes was placed on a second probationary period on November 9, 2004 due to his mislabeling x-ray orientations, incorrectly spelling patient names, and transposing patient identification numbers. Mr. Holmes was placed on the additional probationary status before Ms. Steiner ever became the supervisor of the PUSH Radiology Department, before Mr. Holmes ever suggested he had a learning disability, before Mr. Holmes spoke with Ms. Reckowsky, and before Mr. Holmes filed his EEOC charge. Once Mr. Holmes met with Ms. Steiner, Dr. Miller, and Dr. Sayger on January 10, 2006, to discuss his performance problems, Mr. Holmes was again given time (30 days) to bring his performance up to standard, or he would be terminated. A couple of days thereafter, Mr. Holmes told Ms. Reckowsky that he was being singled out because he had a limited license, and Mr. Holmes did not recall stating that it was because he was male. On January 16, 2006, Mr. Holmes was instructed that a follow-up meeting was scheduled for February 9, 2006 in order to evaluate Mr. Holmes' performance, but after Mr. Holmes filed an EEOC charge on January 19, 2006, Mr. Holmes' employment was terminated at the scheduled February 9 meeting.

14

While it is true that Mr. Holmes' termination occurred shortly after talking to Ms. Reckowsky and filing his EEOC complaint, "a temporal sequence analysis is not a magical formula which results in a finding of a discriminatory cause." *Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 506 (7th Cir. 2004). By itself, temporal proximity would not normally create an issue of material fact as to causation, although it could suffice where the adverse action followed on the heels of the employer's discovery of the employee's protected status. *Id.* Suspicious timing it is not enough here to avoid summary judgment. *See Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 981 (7th Cir. 2004); *see also Sauzek v. Exxon Coal USA, Inc.*, 202 F.3d 913, 918 (7th Cir. 2000) (reasoning that "other circumstances must also be present which reasonably suggest that the two events are somehow related to one another."). Despite Mr. Mr. Holmes suggestion that he has shown other direct proof, including the disparate treatment of similarly situated non-protected employees and evidence of pretext, as detailed above he does not have such evidence, and his reverse gender discrimination claim under Title VII fails as a matter of law.

### B)      Title VII retaliation claim against The Trustees of Purdue University

Mr. Holmes claims that Purdue retaliated against him for reporting what he believed to be unlawful treatment to Purdue's HR Department and/or to the EEOC. Under Title VII, it is "unlawful for any employer to discriminate against an employee for opposing a practice made unlawful by the Act." 42 U.S.C. § 2000e-3(a). In order to establish a *prima facie* case of retaliation under the direct method of proof, a plaintiff must establish that: "(1) he engaged in a statutorily protected activity; (2) he suffered an adverse employment action subsequent to his participation; and (3) there was a causal link between the adverse action and the protected activity." *Burks v. Wis. Dept. of Transp.*, 464 F.3d 744, 758 (7th Cir. 2006). In order to prove a causal link, "the plaintiff is required to show

that the employer would not have taken the adverse action 'but for' the plaintiff's engagement in the protected activity." *McKenzie v. Ill. Dept. of Transp.*, 92 F.3d 473, 483 (7th Cir. 1996).

First, as the Seventh Circuit has stated, "[A]n employer may not retaliate against an employee who has complained about discrimination or other employment practices that violate Title VII . . . ." *Racicot v. Wal-Mart Stores, Inc.,* 414 F.3d 675, 678 (7th Cir. 2005). In this case, Mr. Holmes certainly engaged in statutorily protected activity, when he filed his EEOC complaint, and for the purpose of summary judgment, the Court will also consider his complaint to the HR Department, as sufficient to satisfy the first prong of his retaliation claim. Second, it is undisputed that Mr. Holmes suffered an adverse employment action when he was terminated. However, Mr. Holmes cannot establish a causal link between the adverse action and the protected activity under the third prong of the retaliation claim.

To establish a causal link, Mr. Holmes must show that he was placed on probationary status and ultimately fired as a result of his engaging in protecting activity. Yet, this is not a case of sudden dissatisfaction with an employee's performance following the exercising of a protected right. While it is true that Mr. Holmes was recommended for employment by Ms. Steiner and even received some positive feedback during his employment, it is undisputed that Mr. Holmes continued to mislabel x-rays, was not using the established x-ray protocol, and was improperly performing x-rays, which resulted in an additional 90-day evaluation period—all *before* Mr. Holmes indicated he might have dyslexia (and without any evidence of his sex being a factor in how he was treated). Further, Mr. Holmes was told in January that a follow-up meeting was scheduled for February 9, to discuss his progress. With no progress made, and no improvement suggested anywhere in the record, Mr. Holmes was terminated. Thus, although Mr. Holmes has evidence of a close temporal sequence, he

lacks evidence supporting an inference of a causal link, and taken as a whole, Mr. Holmes' evidence does not create an issue of fact, nor a reasonable inference of retaliation.

To prove retaliation under the indirect approach, Mr. Holmes must show that: (1) he engaged in statutorily protected activity; (2) he met his employer's legitimate expectations; (3) he suffered an adverse action; and (4) he was treated less favorably than similarly situated employees who did not engage in statutorily protected activity. *Metzger,* 519 F.3d at 681. Mr. Holmes unquestionably meets the first and third criteria. But again, Mr. Holmes' claim fails on the second and fourth prong for the simple reason that he was not meeting Purdue's legitimate expectations, nor has he shown that he was  treated less favorably than a similarly situated employee who did not engage in statutorily protected activity.

### C) ADA discrimination claim against Ms. Steiner and Dr. Miller

Mr. Holmes alleges in his Third Amended Complaint that Ms. Steiner and Dr. Miller, in their individual and official capacities, discriminated and retaliated against him in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et. seq.*  Mr. Holmes seeks "only prospective injunctive relief" against Ms. Steiner and Dr. Miller.[5]  (Holmes' Memo. in Opp., p. 1).

*Ex parte Young* allows a plaintiff to sue a responsible state official in his or her official capacity for prospective injunctive relief so long as that individual has the requisite connection with the enforcement of the act, here the ADA. *Ex Parte Young*, 209 U.S. 123, 157 (1908); *see also Radaszewski ex rel. Radaszewski v. Maram*, 383 F.3d 599, 606 (7th Cir. 2004) (noting that *Board*

---

[5] Although it seems unlikely that either Ms. Steiner or Dr. Holmes can provide the prospective injunctive relief Mr. Holmes requests, the Court rules on the merits of Mr. Holmes' ADA claims.  Further, the Court declines Plaintiff's invitation to add Dr. Sayger as a party-defendant, *see* Holmes' Memo. in Opp., p. 7, n. 6, not only because the Court did not hold that ultimate hiring authority is critical to the just adjudication of Mr. Holmes' claim for injunctive relief, but because Plaintiff, as the master of his complaint, has three times amended his complaint, and has had ample opportunity to add any defendants from which Mr. Holmes sought relief.

*of Trustees of the Univ. of Alabama v. Garrett,* 531 U.S. 356, 374 n. 9 (2001) explicitly recognized the right of a private plaintiff to assert an ADA claim for injunctive relief against a state official in federal court); *Bruggeman ex rel. Bruggeman v. Blagojevich*, 324 F.3d 906, 912-13 (7th Cir. 2003) (holding that *Ex Parte Young* authorizes, notwithstanding the Eleventh Amendment, suits for prospective injunctive relief against state officials who are sued in their official capacity). There is no individual liability under the ADA, since there is no record evidence that Dr. Miller or Ms. Steiner could be considered employers. *See EEOC v. AIC Sec. Investigations, Ltd.*, 55 F.3d 1276, 1279 (7th Cir. 1995) (holding that "individuals who do not independently meet the ADA's definition of 'employer' cannot be held liable under the ADA"). Therefore, the Court turns to Mr. Holmes' claims against Dr. Miller and Ms. Steiner in the official capacities.

The ADA prohibits employers from discriminating against qualified individuals with a disability in matters of job application, hiring, advancement, discharge, compensation, training and any other terms and conditions of employment. 42 U.S.C. § 12112(a) (1994). The ADA recognizes two types of discrimination: disparate treatment and failing to provide reasonable accommodations. *Sieberns v. Wal-mart Stores Inc.*, 125 F.3d 1019, 1021-22 (7th Cir. 1997). Mr. Holmes has conceded that the evidence fails to sustain any "failure to accommodate" claim. (Holmes' Memo. in Opp., pp. 2, 8). As such, the Court turns to Mr. Holmes' claim for discriminatory discharge due to his disability.

To establish disability discrimination, Mr. Holmes must show that he is disabled within the meaning of the ADA, that he is qualified to perform the essential functions of the job, either with or without a reasonable accommodation, and that he suffered from an adverse employment action because of his disability. *Nese v. Julian Nordic Const. Co.,* 405 F.3d 638, 641 (7th Cir. 2005); *see*

*Timmons v. Gen. Motors Corp.*, 469 F.3d 1122, 1127 (7th Cir. 2006) (an ADA plaintiff claiming disparate treatment must show that he is protected by the ADA and that his employer violated the ADA by taking adverse action against him because of his disability). Once the plaintiff establishes that he is protected by the ADA, he may employ a direct or indirect method of proving that he was discriminated against under the ADA. *Timmons*, 469 F.3d at 1127. For the reasons that follow, Mr. Holmes' claim fails on the threshold requirement of showing that he is disabled.[6]

"Disability" is defined as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12111(8). According to ADA regulations, "substantially limits" means:

> (i) "[u]nable to perform a major life activity that the average person in the general population can perform" or (ii) "[s]ignificantly

---

[6] Even if Mr. Holmes can show that he is disabled because he was "regarded as" having a mental or physical impairment, and thus is entitled to claim the protection of the ADA, and, assuming Mr. Holmes was qualified to perform the essential functions of the job (even though neither party provided specific argument regarding the essential functions of the job, or Mr. Holmes' qualifications to perform them), Mr. Holmes has not come forward with enough evidence to suggest that he was placed on probation and then discharged because of his perceived disability. *See Leffel v. Valley Fin. Serv.*, 113 F.3d 787, 792 (7th Cir. 1997), *cert. denied*.

As detailed above and incorporated herein, a plaintiff may use either direct or indirect evidence in order to establish a discriminatory discharge. *Leffel*, 113 F.3d at 792. Under the direct method, the plaintiff may show either direct or circumstantial evidence that points to a conclusion that the employer acted as it did for illegal reasons. *Timmons*, 469 F.3d at 1126. Using the indirect method, a plaintiff must first make out a *prima facie* case of discrimination. To make a *prima facie* case of disability discrimination at the summary judgment phase, a plaintiff must offer evidence that: (1) he is disabled within the meaning of the ADA; (2) he was meeting her employer's legitimate employment expectations; (3) he was subject to an adverse employment action; and (4) similarly situated employees received more favorable treatment. *Kampmier v. Emeritus Corp.*, 472 F.3d 930, 937 (7th Cir. 2007). An alternative fourth prong requires the plaintiff to show circumstances that indicate that it is more likely than not that disability was the reason for the adverse action. *See, e.g., Timmons*, 469 F.3d at 1127-28; *Spath v. Hayes Wheels Int'l-Indiana, Inc.*, 211 F.3d 392, 396 (7th Cir. 2000). If the plaintiff establishes all four elements of a *prima facie* case, the burden shifts to the employer to articulate a legitimate nondiscriminatory reason for the adverse employment action. *Timmons*, 469 F.3d at 1126, 1128. Once the employer does so, the plaintiff then has the burden to show that the employer's stated reason is not the real reason, but is a pretext for discrimination. *Id*.

> restricted as to the condition, manner or duration under which an
> individual can perform a particular major life activity as compared to
> the condition, manner, or duration under which the average person in
> the general population can perform that same major life activity."

29 C.F.R. § 1630.2(j)(1). Mr. Holmes' position is that he qualifies for ADA protection because he was "regarded as" having dyslexia or a learning disability.

The parties do not dispute that dyslexia qualifies as a disability under the ADA, or that learning qualifies as a major life activity, but the parties' dispute whether Mr. Holmes was regarded as having dyslexia or a learning impairment. Under a "regarded as" claim, a plaintiff must prove that either: (1) the employer mistakenly believes the employee has a physical impairment that substantially limits a major life activity; or (2) the employer mistakenly believes that an actual, nonlimiting impairment substantially limits a major life activity. *Amadio v. Ford Motor Co.,* 238 F.3d 919, 925 (7th Cir. 2001) (citing *Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 489 (1999)). In other words, the employer "must believe either that one has a substantially limiting impairment that one does not have or that one has a substantially limiting impairment when, in fact, the impairment is not so limiting." *Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 489 (1999). *See also Traveler v. CSX Transp., Inc.* 2007 WL 2500173, 8 (N.D.Ind. 2007) ("An employer regards an employee's condition as 'substantially limiting' if he perceives the employee to be 'significantly restricted as to the condition, manner or duration under which [he] can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.') (citing *Riemer v. Ill. Dep't of Transp.,* 148 F.3d 800, 806 (7th Cir.1998) (quoting 29 C.F.R. § 1630.2(j)(1)(ii))). Here, Mr. Holmes cannot show either.

In the instant case, the record shows that Mr. Holmes has never been diagnosed or tested for dyslexia or a similar learning disability. However, *after* Mr. Holmes was placed on an additional 90-day probation in November of 2004 for mislabeling x-ray orientations (improper "lefts and rights"), incorrectly spelling patient names, and transposing patient identification numbers, Mr. Holmes told Dr. Sayger that he thought maybe he suffered from a learning disability. Dr. Sayger suggested that Mr. Holmes get tested for the same. Not until May 2005, did Mr. Holmes again inform Dr. Sayger of his belief that he had a learning disability or dyslexia, and again, Dr. Sayger suggested that Mr. Holmes be tested. Mr. Holmes certainly indicated, and presumably the Defendants were aware that some of Mr. Holmes mistakes might be due to his having dyslexia, or a learning disability. But, what the record does not show, is that Defendants held exaggerated views about the seriousness of Mr. Holmes' learning disability. *See Cassimy v. Board of Educ. of Rockford Public Schools Dist. No. 205*, 461 F.3d 932, 937 (7th Cir. 2006); *see also, Krocka v. City of Chicago*, 203 F.3d 507, 514 (7th Cir. 2000) (stating that awareness of the condition, however, is not the same thing as a belief that the condition is substantially impairing). Despite Defendants knowledge that Mr. Holmes may have suffered from a learning disability which could have resulted in Mr. Holmes' mislabeling errors, Defendants also knew that Mr. Holmes was able to successfully obtain a limited certificate to be an R.T., and was able to effectively work off of a self-created cheat-sheet. In fact, Mr. Holmes later testified that there was nothing preventing him from meeting the enumerated expectations of his employer. Mr. Holmes also admitted that he told Ms. Reckowsky that he believed he was being singled out because he held a limited license as opposed to a general license, and he never told Ms. Reckowsky that he was unable to fulfill any of the job performance expectations due to a learning disability.

There is no evidence which would allow this Court or any reasonable jury to infer that Defendants regarded Mr. Holmes as suffering from a substantially limiting impairment, or that Mr. Holmes was significantly restricted as to the condition, manner or duration under which he can read and learn, as compared to the condition, manner, or duration under which the average person in the general population can read and learn. *See Rooney v. Koch Air, LLC*, 410 F.3d 376, 382 (7th Cir.2005) ("If the condition that is the subject of the employer's belief is not substantially limiting, and the employer does not believe that it is, then there is no violation of the ADA under the 'regarded as' prong of the statute.").

Lastly, Mr. Holmes is also unable to show with either direct or circumstantial evidence that he was treated as he was, due to a perceived disability. Not only is Mr. Holmes not disabled within the meaning of the ADA, but he was not meeting his employer's legitimate employment expectations, nor can he show that it is more likely than not that a disability was the reason for his termination. While Mr. Holmes may have disagreed with his January 2006 assessment, the mere fact that an employee disagrees with her employer's assessment of his performance does not create a genuine issue of material fact about the genuineness of the employer's perceptions. *See Dey v. Colt Const. & Dev. Co.*, 28 F.3d 1446, 1460 (7th Cir. 1994). Neither will general denials of fault for the performance failures attributed to the employee call the employer's decision into question. *Id.* (citing *Anderson v. Baxter Healthcare Corp.*, 13 F.3d 1120, 1124-25 (7th Cir. 1994)). Only by addressing the specific performance deficiencies identified by the employer, such as by refuting facts that allegedly support the employer's claim of performance deficiencies, can the employee create a factual issue. *Id.* Although the January 2006 statistics did not accurately reflect the number of x-ray retakes taken specifically by Mr. Holmes, it is also true that Mr. Holmes was given many

opportunities to become a "good tech" throughout his entire employment and he failed to heed those opportunities. Mr. Holmes did not refute Defendants' complaints about his performance— he actually admitted to making many repeated errors. There is no inference that discrimination occurred on these facts.

### D)    ADA retaliation claim against Ms. Steiner and Dr. Miller

The ADA prohibits retaliation against any individual who has opposed an act or practice made unlawful by the ADA. 42 U.S.C. § 12203(a). The elements of a retaliation claim are identical under both Title VII and the ADA. *Steffes v. Stephan Co.*, 144 F.3d 1070, 1074 (7th Cir. 1998). *See supra*, Part B.

Importantly, Mr. Holmes admitted that he did not complain to Ms. Reckowsky that he was being discriminated against based on his disability, thus, the Court considers Mr. Holmes' EEOC charge, which was filed on January 16, 2006, as protected activity. Again, Mr. Holmes has failed to show a casual connection between his protected activity and his termination, and he has not shown under the indirect method that he was performing his job satisfactorily, nor has he provided evidence of a similarly situated unprotected employee treated more favorably than he. The failure to satisfy one element of this *prima facie* case is "fatal" to the retaliation claim. *Sublett v. John Wiley & Sons, Inc.*, 463 F.3d 731, 740 (7th Cir. 2006) (citing *Hudson v. Chicago Transit Auth.*, 375 F.3d 552, 560 (7th Cir. 2004)). No retaliation claim under the ADA can survive summary judgment.

## V.  CONCLUSION

Viewing the record in the light most favorable to the non-movant, Mr. Holmes cannot show a violation of his rights under Title VII for reverse gender discrimination, or under the ADA for disability discrimination. The uncontested facts reveal that Mr. Holmes was terminated for

legitimate reasons, unrelated to the protections afforded by Title VII and the ADA. Having been lawfully terminated, Mr. Holmes is not entitled to relief.

Based on the foregoing, the Court **GRANTS** the Motion for Summary Judgment (Doc. No. 66) filed by Defendants The Trustees of Purdue University, Debra Steiner, and William Miller, M.D., and **VACATES** the trial currently set for January 12, 2009 in South Bend, Indiana. This case is considered closed, with each party to bear its own costs.

**SO ORDERED**.

**DATED: December 18, 2008**

_____/s/ ALLEN SHARP_____
**ALLEN SHARP, JUDGE**
**UNITED STATES DISTRICT COURT**